**Electronically Filed
Supreme Court
SCWC-19-0000095
18-SEP-2025
10:03 AM
Dkt. 34 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

ECKARD BRANDES, INC.,
Respondent/Appellant-Appellee,

vs.

DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS,
Respondent/Appellee-Appellee,

and

SCOTT FOYT,
Petitioner/Intervenor-Appellant.

SCWC-19-0000095

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000095; CASE NO. 1CC181000011)

SEPTEMBER 18, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, AND DEVENS, JJ.,
AND CIRCUIT JUDGE VIOLA IN PLACE OF GINOZA, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.   INTRODUCTION

This case concerns a change in an agency's interpretation of a wage classification law, and whether an employer, relying on the agency's prior interpretation, may be penalized for noncompliance with the agency's subsequent interpretation.  We hold, under the circumstances of this case, that the employer, Eckard Brandes Inc., may not be penalized.  Accordingly, we affirm the Intermediate Court of Appeals' (ICA) May 29, 2024 Judgment on Appeal.

## II.   BACKGROUND

Hawai'i Revised Statutes (HRS) chapter 104 governs "Wages and Hours of Employees on Public Works" and regulates labor practices for contractors and other entities that engage in public works projects.  HRS § 104-2(a) (2012) ("This chapter shall apply to every contract in excess of $2,000 for construction of a public work project[.]").  Like its federal counterpart, the Davis-Bacon Act,[1] HRS chapter 104 requires every laborer "performing work on the job site for the construction of

---

[1]     Originally enacted in 1931, the Davis-Bacon Act "set certain minimum labor standards for workers employed in federal contract construction."  Cong. Rsch. Serv., 94-408, The Davis-Bacon Act: Institutional Evolution and Public Policy (updated Nov. 30, 2007).  Notably, the Act mandates that contractors must pay their employees no less than the locally prevailing wage.  40 U.S.C. § 3142(b).

any public work project" to be paid "no less than [the] prevailing wage[]," which is "established by the [Department of Labor and Industrial Relations (DLIR)] director[.]"  HRS § 104-2(b).

DLIR regulations define "[c]onstruction of public work" to include:

> [W]ithout limitation new construction, reconstruction, development, improvement, alteration, repair, renovation, painting, decorating, dredging, shoring, simultaneous sewer inspection and repair, and any other activity performed by a laborer or mechanic employed at the site of a public work or at any property used by the contractor, dedicated for the performance of the contract, such as batch plants, borrow pits, fabrication plants, mobile factories, job headquarters, and tool yards.  As used in this section, "other activity performed by a laborer or mechanic employed at the site" includes the following if the activity is an integral part of or is in conjunction with a construction contract, or if there is substantial construction activity involved in a supply, service, or other type of non-construction contract:
>
> (1)   Manufacturing or furnishing of materials, articles, supplies, or equipment on the job site;
>
> (2)   Warranty work except when done by the manufacturer on defective products or equipment;
>
> (3)   Demolition or excavation;
>
> (4)   Landscaping;
>
> (5)   Termite treatment; and
>
> (6)   Installation at the construction site of items or articles fabricated off-site, such as shelving, drapery, and communications equipment.

Hawaiʻi Administrative Rules (HAR) § 12-22-1 (eff. 1996).[2]

---

[2]     HAR § 12-22-1 has since been amended effective July 23, 2018, but the definition of "[c]onstruction of public work" remains the same.

Here, the underlying dispute centers around the wage classification for cleaning and inspection of sewer pipes, and the subsequent impact of the DLIR's differing interpretations of this question.

## A. Factual Background

Since 1988, Eckard Brandes, Inc. has performed sewer pipeline cleaning, closed-circuit television (CCTV) inspection of pipes, and occasional repairs for various state, county, and private projects in Hawaiʻi. Cleaning, inspection, and repairs did not occur simultaneously. Eckard Brandes employees would first operate a tandem axel Vactor truck with a high-pressure pump to clean the pipe. Once cleaning was complete, Eckard Brandes employees would then use CCTV cameras mounted on self-propelled tractors to inspect the inside of pipes and identify needed repairs. Eckard Brandes occasionally performed repair work following cleaning and inspection. Such repair work required specialized equipment and was a much more time intensive process than cleaning and inspection.

Prior to 2005, Eckard Brandes paid every employee on public works sewer projects the "Sewer Line Tele-Repairer" classification regardless of whether employees completed cleaning and inspection, or further undertook repairs. In 2005, Nelson Befitel, then-Director of the DLIR, sent Eckard Brandes a letter pertaining to wages on public works projects. The letter

4

indicated the wage classification for "Sewer Line Tele-Repair" would be discontinued because sewer cleaning and inspection were not considered construction work under HRS chapter 104:

> This is the time of year when the Department of Labor and Industrial Relations (DLIR) would usually request your assistance in determining the prevailing wages for the Sewer Line Tele-Repairer classification for the Chapter 104, Hawaii Revised Statutes (HRS), Wage Rate Schedule. This letter is to inform you that you will not receive a survey this year because the classification of Sewer Line Tele-Repairer will be discontinued as of the next Wage Rate Schedule, Bulletin Number 461, which will be issued in September 2005.
>
> Input from the industry brought to our attention the distinction between inspection and cleaning versus repair. The inspection and cleaning function is not considered construction work as covered under Chapter 104, HRS, therefore it will not be included in the prevailing wage rate schedule. The repair work is same work that would be classified as Laborer I, a classification that already exists.
>
> Additionally, under Section 104-2(b), HRS, the law states that "prevailing wages shall not be less than the wages payable under federal law to corresponding classes". The U.S. Department of Labor does not include a separate classification for sewer line tele-repairer work for construction projects covered by the federal Davis-Bacon Act. Work of that nature is classified as Laborer I. Thus, maintaining the rate classification of Sewer Line Tele-Repairer creates a prevailing wage that is less than the wages payable under federal law to corresponding classes, and is contrary to the law.

(Emphasis added.)

Between November 2009 and January 2015, Eckard Brandes was a subcontractor or general contractor on ten public works sewer rehabilitation projects, performing pipe cleaning, inspection, and repair for the State of Hawai'i and City and County of Honolulu sewer lines. Eckard Brandes's president testified that whenever Eckard Brandes was conducting repairs on

5

sewer pipes, it paid its employees at the Laborer I or II wage classification rates pursuant to HRS chapter 104, depending on the tools they used.  On days where Eckard Brandes was conducting cleaning and inspection work only, employees were paid the regular company rate, as the work was no longer considered a construction activity under HRS chapter 104.  When bidding on the ten public works projects at issue, Eckard Brandes – relying on the 2005 Befitel letter – assumed their employees would be paid at the lower company rate because cleaning and inspection work was not covered by HRS chapter 104.

From May 2011 to July 2013, Petitioner Scott Foyt was employed by Eckard Brandes and worked on the ten public works projects at issue.  Foyt primarily operated Eckard Brandes's Vactor truck, and occasionally drove a water truck and roll-off debris truck to conduct Eckard Brandes's cleaning work.  Foyt also occasionally assisted other Eckard Brandes employees with CCTV inspection and repairs.  Following the DLIR's guidance under the 2005 Befitel letter, Foyt was paid the Laborer I or Laborer II rates when Eckard Brandes conducted repair work on the project site, and was otherwise paid the lower company rate when performing cleaning and inspection only, including operating the Vactor truck.  Had Foyt been classified as a Laborer I for the cleaning and inspection work he performed at

Eckard Brandes's company rate, he would have been paid an additional $29,719.07.

In 2012, the City and County of Honolulu requested clarification from the DLIR on the proper wage classification for workers who perform sewer pipe cleaning and inspection. The City noted their understanding that "in previous determinations from [DLIR]," cleaning and inspection work was determined not to be subject to prevailing wages, but expressed their position that it should be subject to the Laborer I rate as the work "is an integral part of the construction project" under HAR § 12-22-1.

Nine months later, on September 6, 2013, DLIR Administrator Pamela Martin responded, writing that while DLIR's position remained "unchanged for strictly CCTV inspection and cleaning work only," cleaning and inspection work would be subject to HRS chapter 104 when it is required for the repair of sewer pipes:

> [U]nder Section 12-22-1, Hawai'i Administrative Rules, the definition of "construction of a public work" includes without limitation new construction, reconstruction, development, improvement, alteration, repair, renovation, painting, decorating, dredging, shoring, simultaneous sewer inspection and repair, and any other activity performed by a laborer or mechanic employed at the site of a public work.
>
> City and County repair and/or rehabilitation of sewer pipe projects which require cleaning and CCTV inspection are covered under Chapter 104, HRS. The cleaning and CCTV inspection activities are deemed an integral part of or in

conjunction with a construction contract subject to Chapter 104, HRS. Workers must be classified and paid the closest existing classification as published in the Wage Rate Schedule.

(Emphasis added.)

A few weeks later on September 23, 2013, representatives from Eckard Brandes and DLIR met to clarify DLIR's position on the applicability of HRS chapter 104 to sewer cleaning and inspection. Eckard Brandes representatives came away from the meeting understanding that all cleaning, inspection, and repair work would be classified at the Laborer I rate effective the date of the meeting, September 23, 2013 — "not retro-actively for contracts already awarded or work performed on." Thereafter, Eckard Brandes began paying its employees the Laborer I rate on every public works project for cleaning and inspection work, regardless of whether the cleaning and inspection was performed simultaneous to the repairs.[3]

## B.  DLIR Proceedings

On October 30, 2013, Foyt filed a complaint with the DLIR Wage Standards Division, disputing his wage classification

---

[3]     On November 20, 2014, DLIR Director Dwight Takamine determined that workers who perform sewer line pipe cleaning and CCTV inspection work on public works projects were classified under HRS chapter 104 as Plumber, Laborer I, or Laborer II, depending the type of project and work performed. "[W]orkers who do cleaning and inspection of sewer lines" are classified as plumbers "when the work is within a building to the property line." "[W]hen the work is through the public disposal system (sewer mains)," workers are classified Laborer I for "performing inspection, operating the CCTV equipment and performing cleaning with the use of power tools and equipment," and Laborer II for "using non-powered hand tools to perform the cleaning." Because the public works projects at issue pre-date 2014, these classifications are not applicable here.

for the public works projects on which he performed sewer cleaning and repair work as an Eckard Brandes employee.

Over one year later in January 2015, Foyt's complaint was assigned to Labor Law Enforcement Specialist Sheryl Lee (Investigator Lee), who after investigating Foyt's complaint, recommended that Eckard Brandes be issued a Notification of Violation because it should have paid Foyt the prevailing wage for truck drivers regardless of whether he was performing sewer cleaning and inspection or repair. Investigator Lee conferred with representatives from the Operating Engineers Union, Hawaiian Dredging, and the Laborers Union, and understood that workers who drove trucks requiring a commercial driver's license (CDL) to and from the jobsite would be paid the truck driver rate. Investigator Lee found that Foyt should have been paid the prevailing wage as a "Truck Driver Tandem Dump Truck, over 8 cu. Yds. (water level); Water Truck (over 2,000 gallons)" (Truck Driver) rather than the Laborer I or Laborer II prevailing wage because Foyt was "one of few employees who would operate the vacuum truck because a CDL is required."

On May 4, 2017, then-DLIR Director Linda Chu Takayama adopted Investigator Lee's recommendations and issued Eckard Brandes a Notification of Violation of HRS chapter 104. Because Foyt should have been paid under the Truck Driver wage classification rather than the Laborer I or Laborer II

classifications, the DLIR assessed back wages due and a 10% penalty totaling $60,131.12.

Eckard Brandes appealed the Notification of Violation pursuant to HRS § 104-23(b) (2012), and a hearing was held in August 2017. Eckard Brandes primarily argued that sewer cleaning and inspection work was not covered under HRS chapter 104, and in any event, it relied on the 2005 Befitel letter, which was consistent with the DLIR's longstanding position that cleaning and inspection work was not subject to wage classification. It also emphasized that the Truck Driver classification was not "industry practice," and that there is no reference in DLIR Adminstrator Martin's 2013 letter to sewer workers being classified as truck drivers.

In support of Eckard Brandes's arguments, President Jeff Iwasaki-Higbee, Mark Goodrowe, owner of Eckard Brandes's competitor Underground Services, Inc., and Eldon Franklin, retired Wastewater Division Chief for the City and County of Honolulu's Department of Design and Construction testified at the hearing. Iwasaki-Higbee testified about Eckard Brandes's work on public works projects, its reliance on the 2005 Befitel letter, and its understanding that the Laborer I or Laborer II wage classification would only apply to cleaning and inspection work prospectively effective September 2013. Iwasaki-Higbee recounted the September 23, 2013 meeting with DLIR

representatives, and testified that he primarily sought to ensure ongoing projects would not be impacted by the DLIR's new position that cleaning and inspection work be paid at the Laborer I or Laborer II wage. Although there was no written agreement, Iwasaki-Higbee testified that he walked away from the meeting with the understanding that Eckard Brandes was not required to retroactively adjust its wages for ongoing public works projects.

Mark Goodrowe of Underground Services, Inc. testified that from 2006 until DLIR Administrator Martin's September 2013 letter, it similarly paid its employees conducting sewer cleaning and CCTV inspection their lower company rate on public works projects, regardless of whether an employee operated a Vactor truck. Goodrowe further testified that at no time was he or other Underground Services representatives informed that their employees operating trucks needed to be paid the Truck Driver wage.

Retired Wastewater Division Chief Eldon Franklin testified about the confusion in 2012 and 2013 surrounding whether sewer cleaning and inspection were subject to HRS chapter 104 wage classification. Goodrowe and Franklin attended the September 23, 2013 meeting with DLIR and Eckard Brandes, and both testified that they also came out of the meeting with the understanding that moving forward, workers performing sewer

cleaning and inspection would be paid the Laborer I or II classification.

In support of the DLIR's Notification of Violation, the Hearings Officer heard testimony from Investigator Lee, Brandon Ili of the International Union of Operating Engineers, Local 3, and Foyt. Both Investigator Lee and Ili testified that under the work practices of the Operating Engineers, persons driving and operating a vacuum truck would be compensated at the higher truck driver wage classification. Ili further testified that although workers such as Foyt may be cleaning sewer pipes at a construction job site, the Truck Driver classification would be appropriate because the operation and use of a Vactor truck with vacuum and water capabilities requires the driver to hold a CDL. Foyt testified in detail about the scope of work he performed as an Eckard Brandes employee, noting his primary role was to operate the Vactor truck and to drive it to and from the jobsite, and on occasion, to assist other Eckard Brandes employees with CCTV inspection and repairs.

In a December 6, 2017 written decision and order, the Hearings Officer determined that the DLIR correctly classified Foyt as a Truck Driver. "Based on a misclassification of work as a [L]aborer I or [L]aborer II, rather than Truck Driver," the Hearings Officer concluded Foyt was owed $54,664.65 in back

12

wages under the Truck Driver classification.[4]  The Hearings Officer reasoned that without Eckard Brandes employees like Foyt "performing the cleaning and inspection, the general contractor[s] would not be able to perform their repair or replacement of the sewer pipe line," and therefore concluded that cleaning and inspection "was an integral part of or in conjunction with a construction repair or replacement sewer pipe project" and thus subject to HRS chapter 104.

The Hearings Officer determined that the 2005 Befitel letter "appear[ed] to have confusing or conflicting information" and "reflect[ed] disagreements in the prevailing practice that were being resolving under different administrations."  However, the Hearings Officer determined that while the "letter does not address or clarify the workers classification [for an employee] who drives the truck and operates the equipment of the job site," federal precedent "gives the International Operating Engineers the authority to set the prevailing area practices, and their classification is Truck Driver[.]"

C. **Appellate Proceedings**

Eckard Brandes appealed the Hearing Officer's decision and order to the Circuit Court of the First Circuit (circuit

---

[4]     It appears that the Hearings Officer mistakenly found that Foyt was paid at the Laborer I or Laborer II wage classification for all work he performed as an Eckard Brandes employee.  However, the record reflects that Foyt was paid the lower company rate for cleaning and inspection work.

court) in 2018.[5]  Following briefing and oral argument, the circuit court orally reversed the DLIR Hearing Officer's decision and order.  The circuit court's basis for reversal was Eckard Brandes's reasonable reliance on the 2005 Befitel letter:

> The basis for the [circuit court's] decision is that it was arbitrary and capricious for the [DLIR] to vary from clear statements made in the director's July 26, 2005 letter upon which [Eckard Brandes] reasonably relied in calculating its expenses to submit its bids on state contracts.  So basically the State cannot change the rules after a clear statement like this without notice being given to the employer, such as it arguably was in 2013 in the meeting with [Eckard Brandes representatives and DLIR].  So the court is not ruling that [the 2013 letter] was a correct decision by [DLIR].  The court is just ruling that it cannot be applied retroactively.
> So it was a misapplication of the law for the Wage Standards Division not to apply the directives contained in the director's July 26, 2005 letter.  So because the parties did not controvert and [Foyt] agreed that he was paid for the correct number of hours, the only things he was contesting was the classification.  And since the classification used by [Eckard Brandes] was consistent with the statements made in Mr. Befitel's or the director's July 26, 2005 letter, it was error for the Wage Standards Division to find otherwise.

(Emphases added.)

In its written order, the circuit court further stated that the DLIR "was bound by the July 2005 letter, from then Director Nelson Befitel, that the work of sewer line cleaning was not subject to Chapter 104 HRS and therefore, the work performed by [Foyt] at the time, was not subject to Chapter 104 HRS."

Foyt filed a motion to intervene and appealed the circuit court's reversal of the DLIR's Hearing Officer's

---

[5]     The Honorable Keith K. Hiraoka presided.

14

decision and order, arguing the matter directly resulted in his loss of $54,664.65 in wages under the Truck Driver classification. After the ICA dismissed Foyt's appeal for lack of jurisdiction, this court vacated the ICA's dismissal and instructed the ICA to address the merits of the case.[6] Eckard Brandes, Inc. v. Dep't of Lab. & Indus. Rels., 146 Hawai'i 354, 364, 463 P.3d 1011, 1021 (2020).

On remand, Foyt argued that the hearing officer's decision was supported by substantial evidence and was not clearly erroneous. He contended his cleaning and inspection work were subject to HRS chapter 104 because they are an "integral part" of construction projects on which Eckard Brandes was a subcontractor. Therefore, Foyt argued, Eckard Brandes could not have reasonably relied on the 2005 Befitel letter, nor could it have been used to invoke estoppel against DLIR's 2017 Notice of Violation.

The ICA disagreed. Addressing the merits of Foyt's appeal, the ICA affirmed the circuit court's decision. It reasoned that the wages Eckard Brandes paid Foyt were consistent with the 2005 Befitel letter, which Eckard Brandes reasonably relied upon before receiving conflicting instructions from the

---

[6] Although Foyt's appeal to the ICA was untimely, we held his untimely appeal was "excusable neglect" because Foyt was not a party to the case and due to the timing of the holiday season, Foyt was only able to retain counsel the day before the deadline to appeal the circuit court's decision. Eckard Brandes, 146 Hawai'i at 360-61, 463 P.3d at 1017-18.

DLIR in 2013. Therefore, the ICA held the circuit court did not err when it determined the DLIR was arbitrary and capricious when it "retroactively" applied its 2013 interpretation of HRS chapter 104's applicability to sewer cleaning and inspection "without notifying [Eckard Brandes] that it was not entitled to rely on Director Befitel's 2005 Letter."

Foyt applied for writ of certiorari, which we accepted.

### III. STANDARD OF REVIEW

> [W]hen reviewing a determination of an administrative agency, we first decide whether the legislature granted the agency discretion to make the determination being reviewed. If the legislature has granted the agency discretion over a particular matter, then we review the agency's action pursuant to the deferential abuse of discretion standard (bearing in mind the legislature determines the boundaries of that discretion). If the legislature has not granted the agency discretion over a particular matter, then the agency's conclusions are subject to de novo review.

Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 419–20, 91 P.3d 494, 501–02 (2004).

> An agency's conclusions of law are reviewed de novo, while an agency's factual findings are reviewed for clear error. A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.

Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, AFL-CIO, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) (internal quotation marks, citations, and brackets omitted).

## IV.  DISCUSSION

Foyt contends that Eckard Brandes erroneously relied upon the 2005 Befitel letter.  He argues the letter was in "direct conflict" with HRS chapter 104 and its related regulations.  In other words, Foyt contends that because the 2005 DLIR interpretation of HRS chapter 104 and its relevant regulations was erroneous as a matter of law, the DLIR could not be estopped from penalizing Eckard Brandes.  We disagree, and conclude Eckard Brandes's reliance on the 2005 Befitel letter, under the facts of this case, was reasonable and the DLIR was estopped from applying its later interpretation of HRS chapter 104 retroactively to Eckard Brandes.

Although the doctrine of equitable estoppel is limited in its application against the government, this court has "explicitly maintained the validity of the notion that a government can be estopped."  Filipo v. Chang, 62 Haw. 626, 635, 618 P.2d 295, 300 (1980); see Yamada v. Nat. Disaster Claims Comm'n, 54 Haw. 621, 629, 513 P.2d 1001, 1006 (1973) ("[T]he doctrine of equitable estoppel is fully applicable against the government if it is necessary to invoke it to prevent manifest injustice.").  Consistent with courts' "reluctance" to apply estoppel against the government, we have recognized that "estoppel cannot be applied to actions for which the agency or

17

agent of the government has no authority." Filipo, 62 Haw. at 634, 618 P.2d at 300.

That is not the case here. The plain language of HRS chapter 104 makes clear that "[t]he prevailing wages shall be established by the [DLIR] director." HRS § 104-2(b)(1). Then-DLIR Director Befitel was therefore properly authorized to instruct Eckard Brandes that the Sewer Line Tele-Repairer classification would no longer be recognized, and that cleaning and inspection work would not be covered under HRS chapter 104. Cf. Turner v. Chandler, 87 Hawaiʻi 330, 334, 955 P.2d 1062, 1066 (App. 1998) (holding that since the state agency had no authority to confer benefits on appellant during a particular period, the contrary representation made to the appellant by an agency caseworker was unauthorized and ultra vires).

Foyt cites to the Ninth Circuit's test in applying the government estoppel doctrine, and argues that Eckard Brandes is unable to meet its test "to provide a shield to [his] prevailing wage claim." See Wagner v. Dir., Fed. Emergency Mgmt. Agency, 847 F.2d 515, 519 (9th Cir. 1988). In Wagner, the Ninth Circuit adopted a "stringent test" requiring parties invoking government estoppel to "establish affirmative misconduct going beyond mere negligence; even then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition

18

of the liability."  Id. (internal quotation marks omitted).

However, this court has suggested Hawai‘i has a less stringent

standard than the Ninth Circuit – that "[o]ne invoking equitable

estoppel must show that he or she has detrimentally relied on

the representation or conduct of the person sought to be

estopped, and that such reliance was reasonable."  Doherty v.

Hartford Ins. Grp., 58 Haw. 570, 573, 574 P.2d 132, 134-35

(1978) (emphasis added).

Articulating a similar standard, courts in the First

Circuit have expressed that a defense of equitable estoppel may

be viable where "there has been reasonable reliance on

affirmative misconduct attributable to the [government]."

Griffin v. Reich, 956 F. Supp. 98, 107 (D.R.I. 1997) (quoting

United States v. Ven-Fuel, Inc., 758 F.2d 741, 761 (1st Cir.

1985) (internal quotation marks omitted).  The measure of what

amounts to "affirmative misconduct" is "only moderately

demanding," but nonetheless must rise above "mere inaction,

delay or sloth on the part of the government."  Id. at 108.

Griffin involved the applicability of prevailing wages

at a public housing development funded by the United States

Department of Housing and Urban Development (HUD).  Id. at 100-

01.  There, the plaintiff contractor challenged a determination

by the Wage and Hour Division of the United States Department of

Labor (DOL) that the contractor should have been paying

19

prevailing wages under the Davis-Bacon Act to its workers at an off-site fabrication facility related to the HUD project.  Id. at 100-04.  The plaintiff had sought advice from HUD regarding the wages of workers at the off-site facility.  Id. at 101.  The HUD Director of Housing Management replied with a letter stating that "Davis-Bacon Wage Rates do not apply to the fabrication of building components."  Id.  On review, the United States District Court for the District of Rhode Island opined "that if ever there was a case where equitable estoppel should explicitly apply against the government, this is it, provided the factual predicates are found to exist."  Id. at 108.  That court remanded the proceedings to DOL to make factual determinations concerning the application of equitable estoppel and directed that "[DOL]'s inquiry should focus first on whether plaintiffs reasonably relied on affirmative representations by HUD," and second, "whether plaintiffs, in fact, complied with HUD's policies."  Id. at 109.  Summarizing the administrative and procedural history of the case, the court noted that the disparate interpretation of policy by the two government agencies had resulted in a "bureaucratic whipsaw" for the plaintiff.  Id.  "To right this wrong," the court held that equitable estoppel should apply if plaintiffs relied on and were in compliance with "HUD's policies and representations concerning the applicability of Davis-Bacon requirements."  Id.

20

Similar circumstances are present here, although unlike Griffin, the record makes clear that Eckard Brandes reasonably relied on "affirmative representations" by the DLIR in the 2005 Befitel letter, and accordingly complied with its guidance.  Cf. id.  The 2005 letter differentiated between repair versus inspection and cleaning, stating that employees doing repair work must be paid the prevailing Laborer I wage, while employees doing inspection and cleaning need not be as it "is not considered construction work."  Eckard Brandes, having received the 2005 Befitel letter, adjusted how it paid its employees and how it submitted bids for the public works projects Foyt worked on between 2011 and 2013.  Notably, the record reflects that until DLIR Administrator Martin's September 6, 2013 letter, the DLIR did not clarify or retract its 2005 guidance.  Indeed, more than a year after the 2005 Befitel letter, DLIR Director Befitel again confirmed that the "cleaning of sewer lines, [CCTV] recording of sewer lines, bypassing of wastewater, reporting, documenting, and other incidentals, does not warrant any determination under [HRS] Chapter 104, because the work is not considered as construction work," in a November 2006 letter to the County of Maui Wastewater Reclamation Division.

Furthermore, the record reflects that the Truck Driver classification is not industry practice as none of the

applicable wage classifications prior to the DLIR's 2017 Notification of Violation were based on operating a truck. Rather, prior to 2005, workers who performed any kind of sewer cleaning, inspection, or repair were classified as Sewer Line Tele-Repairers.[7]  From 2005 until DLIR Administrator Martin's September 2013 letter, the pertinent wage classification for workers conducting sewer repairs was Laborer I or Laborer II, depending on the equipment used.  Additionally, the DLIR's September 2013 letter made no distinction between cleaning, inspection, or operating a Vactor truck (which is part of sewer pipe cleaning), and made no indication a separate Truck Driver classification should apply.[8]  Therefore, because the Truck Driver classification was not an applicable classification prior to the DLIR's 2017 Notification of Violation, we conclude the circuit court did not err when it determined that it was

---

[7]  Although a description of the Sewer Line Tele-Repairer classification is not in the record before this court, subsequent applicable wage classifications of sewer line workers are in the record.  Notably, they do not differentiate between workers who operate trucks and those who do not, suggesting the pre-2005 Sewer Line Tele-Repairer classification also did not differentiate truck drivers from other sewer line workers.

[8]  The record further suggests that other Hawaiʻi companies that conduct sewer work do not use the Truck Driver wage classification.  For example, the owner of Eckard Brandes's competitor, Underground Services, Inc., testified at the hearing that at no time was he informed by the DLIR or the City and County of Honolulu that his employees who operate Vactor trucks must be paid at the Truck Driver rate.  Additionally, Eckard Brandes's President testified that another competitor, whose employees are members of the Operating Engineers, Local 3 union and conduct similar sewer cleaning and inspection, paid their employees the Laborer I rate regardless of whether the employee operated a Vactor truck.

"arbitrary and capricious for the [DLIR] to vary from the clear statements made in the director's July 26, 2005 letter upon which [Eckard Brandes] reasonably relied[.]"

Given these circumstances, to require Eckard Brandes to have paid Foyt and other similarly situated employees the Truck Driver wage, when it could not have anticipated that the DLIR would later switch course in 2013, would result in a "bureaucratic whipsaw." See Griffin, 956 F. Supp. at 109. In reaching this conclusion, we need not determine whether the 2005 Befitel letter's interpretation that sewer cleaning and inspection is outside the scope of HRS chapter 104 when performed as "an integral part of or in conjunction with a construction contract" was erroneous as a matter of law. See HAR § 12-22-1.

Even if the 2005 Befitel letter's analysis of the applicability of HRS chapter 104 to sewer cleaning and repair was faulty, we conclude that DLIR retroactively changing its 2005 position without notifying Eckard Brandes that it was not entitled to rely on the 2005 letter was arbitrary and capricious. See Paul's Elec. Serv., Inc., 104 Hawai'i at 419-20, 91 P.3d at 501-02. And we further conclude that the ICA did not err when it applied the government estoppel doctrine to this case.

23

## V.    CONCLUSION

For the foregoing reasons, we affirm the ICA's May 29, 2024 Judgment on Appeal affirming the circuit court's December 19, 2018 Order Reversing Decision of the Department of Labor and Industrial Relations and Final Judgment.

Shawn A. Luiz
for petitioner

Richard M. Rand
for respondent

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Vladimir P. Devens

/s/ Matthew J. Viola

